IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| TERRI OCAMPO | * | |
| | * | Civil Action No. CCB-19-2875 |
| v. | * | |
| | * | |
| MEGAN BRENNAN, POSTMASTER | * | |
| GENERAL | * | |

**MEMORANDUM**

This lawsuit concerns a dispute between Terri Ocampo and her former employer, the United States Postal Service ("USPS"). Ocampo alleges that USPS failed to make reasonable workplace accommodations and discriminated against her because of her disability. Before the court is the defendant's motion to dismiss (ECF 21). The matter has been fully briefed and no oral argument is necessary. *See* Local Rule 105.6 (D. Md. 2018). For the following reasons, the motion will be granted in part and denied in part.

**BACKGROUND**

Defendant USPS hired Ocampo as a City Carrier Assistant ("CCA") in August 2017. Throughout her employment, Ocampo was supervised by three customer service supervisors, Phillip Baldwin, Troy Griffin, and Tashira Jefferies. (ECF 1, Compl. ¶ 9). As a CCA, Ocampo was responsible for delivering and collecting mail "on foot or by vehicle under varying road and weather conditions in a prescribed area." (ECF 21-2, Position Description, City Carrier Assistant).

By August 2018, Ocampo was receiving medical care for diabetes. (ECF 1, Compl. ¶¶ 10, 13). On August 27, 2018, Ocampo reported for work and was assigned an outdoor route where she was to deliver mail on foot. The outdoor temperature that day reached a heat index of

over 100 degrees Fahrenheit.[1] (*Id.* ¶ 10). Due to the high heat, Ocampo began to feel sick. Ocampo contacted Baldwin and asked him if she could return to the office for a break to get cool air. Baldwin refused the request and told Ocampo to find shade under a tree and "keep it moving." (*Id.* ¶ 11). Ocampo had at this point already tried to take short breaks under shaded trees; this did not improve her condition. After about another hour, Ocampo returned to the office to take a break in an air-conditioned environment. After about twenty minutes in the air conditioning, Ocampo returned to her walking route and completed her work assignment for the day without feeling ill. (*Id.*).

On the following day, August 28, Ocampo reported for work. The weather forecasted that day, and for the remainder of the week, was of a heat index of over 100 degrees Fahrenheit. Because Ocampo had felt ill in the high heat the day before and expected similar conditions, she asked Baldwin if her assignment could be changed to doing collection, delivering packages, or doing parts of routes that did not involve her walking in the heat for the entire day. Baldwin responded that a CCA "ha[d] to have street time" and assigned Ocampo a walking route. Ocampo apparently completed her walking route that day in "extreme heat." (*Id.* ¶ 12).

On August 29, Ocampo called out sick from work, because she was feeling ill after having worked in the heat. She visited her doctor, who wrote her a medical note stating in part that Ocampo was "currently under [the doctor's] medical care for diabetes. Please make sure patient is able to take more frequent breaks during days with high heat and [can] be offered work

---

[1] "The Heat Index is a measure of how hot it really feels when relative humidity is factored in with the actual air temperature." *Heat Index*, National Weather Service, https://www.weather.gov/safety/heat-index (last accessed Jan. 19, 2021). Although Ocampo's complaint lists the heat index on August 27, 2018 as "more than one hundred degrees Celsius," (ECF 1, Compl. ¶ 10) the court assumes this is a drafting error, and that the actual alleged heat index is 100 degrees Fahrenheit, as a heat index of 100 degrees Celsius would mean that a person would have felt it was 212 degrees Fahrenheit, which far exceeds the hottest temperatures ever recorded. *See This Month in Climate History: Earth's Hottest Temperature*, National Centers for Environmental Information, https://www.ncdc.noaa.gov/news/month-climate-history-earth%E2%80%99s-hottest-temperature (last accessed Jan. 19, 2021) (noting the hottest recorded temperature as 134 degrees Fahrenheit, in 1913).

in [an] air-conditioned environment, as extreme weather can have [a] negative health impact." (*Id.* ¶ 13). Ocampo reported for work the following day, presented the doctor's note to one of her supervisors, and requested that defendant make an accommodation wherein she would be able to take frequent breaks and be offered work in an air-conditioned environment. (*Id.* ¶ 14). On that day, Ocampo was assigned to work collections and to deliver mail to two-high rise buildings with air conditioning. (*Id.*).

On August 31, Ocampo reported to work and was assigned a walking route with no access to air conditioning, despite having been given a route with air conditioning the day before. Ocampo asked Baldwin why she was not assigned to work collections, to deliver mail in buildings with air conditioning, or to complete some part of an outdoor route. Baldwin responded that Ocampo was not fit for duty if she could not complete an outdoor walking route. (*Id.* ¶ 15). Ocampo's assignment was not altered, and she worked her walking route that day. Because of the high temperature, Ocampo took two hours longer to complete her route than another supervisor, Jeffries, expected. Ocampo alleges that Jeffries berated her for taking a long time to complete the assignment. (*Id.* ¶ 16).

Ocampo contacted her collective bargaining unit to register a grievance against Baldwin for denial of a reasonable accommodation and, for the four days that followed, Ocampo did not report to work because she feared getting sick. On September 4, 2018, Ocampo's union representative contacted Ocampo and told her to call Baldwin. Ocampo did so, and Baldwin told Ocampo to report to work the following day, September 5. (*Id* ¶ 17). On the morning of the 5th, Ocampo reported for work and was called into a meeting with Baldwin, Jefferies, Griffin, Cheryl Taylor (who participated by telephone), and Ocampo's union representative. (*Id.* ¶ 18). Ocampo alleges that during the meeting, Taylor told her that she had to work seven days a week, eleven

and a half to twelve hours per day and Griffin remarked that if he had known Ocampo was sick, she would not have been hired. (*Id.*) Jeffries claimed that Ocampo had effectively resigned on August 31, after not reporting for work. (*Id.* ¶ 19). Ocampo expressed during the meeting that she felt she was being forced to resign. (*Id.* ¶ 18).

On September 7, Ocampo filed a discrimination complaint with the USPS Equal Employment Opportunity office. She received a Final Agency Decision from the EEO office on July 2, 2019, and filed this lawsuit on September 30, 2019, alleging that she was constructively discharged and that the defendant discriminated against her because of her disability and refused to make a reasonable accommodation for her, in violation of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794 *et seq.* and Title 20 of the Maryland Code, State Government Article (the Maryland Human Relations Act ("MHRA")).

## STANDARD OF REVIEW

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally, although courts "must view the facts alleged in the light most favorable to the plaintiff," they "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable

4

conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S. ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013) (quoting *Wag More Dogs, LLC v. Cozart,* 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

### A. State Law Claims

As an initial matter, Ocampo cannot proceed on her MHRA claims or her claim of constructive discharge. Ocampo's state law claims are "based on the same factual predicate as [her] disability discrimination claims . . . covered by the Rehabilitation Act." *Gibson v. Henderson*, 129 F. Supp. 2d 890, 903 (M.D.N.C. 2001). Ocampo may thus only recover under the Rehabilitation Act, because "the Rehabilitation Act is the exclusive means by which a plaintiff may raise claims against federal agencies relating to disability discrimination." *Berkner v. Blank*, Civil Action No. DKC 12-1390, 2013 WL 951562, at *8 (D. Md. Mar. 11, 2013) (citing *Brown v. Henderson*, 6 Fed. App'x 155, 156 (4th Cir.2001)), *aff'd sub nom. Berkner v. Pritzker*, 561 Fed. App'x 279 (4th Cir. 2014).[2] Accordingly, Ocampo's state law claims will be dismissed.

### B. Rehabilitation Act Claims

The Rehabilitation Act prohibits federal agencies from discriminating against a qualified individual "solely by reason of her [] disability." 29 U.S.C. § 794(a). Ocampo alleges that defendant violated the Rehabilitation Act by failing to accommodate her diabetes-related symptoms and by intentionally discriminating against her because of her condition.

#### a. Failure to Make Reasonable Accommodations

To establish a claim for failure to make reasonable accommodations under the Rehabilitation Act, "plaintiff must demonstrate that (1) she was a qualified person with a

---

[2] Unpublished opinions are cited for the persuasiveness of their reasoning and not for any precedential value.

5

disability; (2) the employer had notice of the disability; (3) the plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the employer nonetheless refused to make the accommodation." *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019), *cert. denied sub nom. Hannah v. Maguire*, 140 S. Ct. 1294 (2020). Defendant argues that Ocampo's complaint fails to adequately allege the first, third, and fourth prongs of this claim. The court addresses each of the contested prongs in turn.

### i. *Disability under the Rehabilitation Act*

The Rehabilitation Act adopts the Americans with Disabilities Amendments Act ("ADAA")'s definition of "disability," *see* 29 U.S.C. § 705(9)(B); *Brady v. Bd. of Ed. of Prince George's Cnty.*, 222 F. Supp. 3d 459, 468 (D. Md. 2016), *aff'd* 707 Fed. App'x 780 (4th Cir. 2018)—"(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include, but are not limited to "caring for oneself, . . . walking, standing, lifting . . . working," and "operation of a major bodily function, including but not limited to, functions of the immune system . . . respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2).

"The [ADAA] was intended to make it 'easier for people with disabilities to obtain protection[,]'" by making the "'primary object of attention in cases . . . whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability.'" *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting 29 C.F.R. § 1630.1(c)(4)). Thus, "[t]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id.* (quoting Pub. L. No. 110–325, § 2(b)(5) (2008)). For instance, a substantially

limiting impairment "need not prevent, or significantly or severely restrict" an individual from performing a major life activity; it need only "substantially limit[] the ability of an individual" from performing the activity "as compared to most people in the general population." *Id.* at 573 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). The EEOC's regulations implementing the ADAA note that under these generous principles "some types of impairments will, in virtually all cases . . . be found to impose a substantial limitation of a major life activity." 29 C.F.R. § 1630.2(j)(3)(ii). Because "diabetes substantially limits endocrine function," it is one of those impairments which will "almost always" substantially limit a major life activity and for which "the necessary individualized assessment should be particularly simple and straightforward." *Id.* § 1630.2(j)(3)(ii)–(iii).

      Here Ocampo alleges that she was under the medical care of a doctor for diabetes and that her condition limits her ability to walk in high temperature to the extent that after attempting to do so for an entire day, she was unable to work the following day. Defendant argues that these allegations are insufficient to show at the motion to dismiss stage that Ocampo is disabled under the Rehabilitation Act, because she does not allege the type of diabetes with which she was diagnosed or whether she takes medication or engages in behavioral modifications to treat her diabetes. (ECF 21-1 at 7). Though defendant points to several cases where a plaintiff has shown a disability "merely by alleging that she suffers from diabetes and takes medication for it," *see e.g.*, *Hensel v. City of Utica*, No. 6:15-CV-0374 (LEK/TWD), 2017 WL 2589355, at *4 (N.D.N.Y. June 14, 2017) (citing cases), the court is not persuaded that these cases demonstrate that a plaintiff must show she takes medication in order to show her diabetes qualifies as an impairment that substantially limits one or more major life activities.[3] The ADAA "requires

---

[3] The USPS also cites *Quarles v. Md. Dep't of Human Res.*, No. MJG-13-3553, 2014 WL 6941336, at

7

courts to evaluate diabetes 'in terms of its limitations on major life activities when the diabetic *does not take* insulin injections or medicine and *does not require* behavioral adaptations such as a strict diet.'" *Id.* (quoting *Rohr v. Salt River Project Agric. Imp. & Pwr. Dist.*, 555 F.3d 850, 862 (9th Cir. 2009)) (emphasis added). As an *unmitigated* condition, diabetes unquestionably "substantially limits endocrine function." 29 C.F.R. § 1630.2(j)(3)(iii). Ocampo has alleged that she was, during her employment with defendant, under the medical care of a doctor for diabetes, who warned defendant that extreme weather would have a "negative impact" on Ocampo's health. (ECF 1, Compl. ¶¶ 10, 13). After spending time in the heat, against her doctor's advice, Ocampo alleges she was too ill to report for work, an uncommon reaction "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii)). While Ocampo includes no detail of what her diabetes treatment entails, nothing in the complaint suggests that Ocampo's diabetes is somehow less serious or affects her to such a lesser extent that the court is prepared to conclude, at the motion to dismiss stage, that this is one of the rare cases in which diabetes is not a disability as defined by the ADAA.

### ii. *Whether the Requested Accommodation was Reasonable*

The USPS next argues that even if Ocampo was disabled, she could not perform the essential functions of her position with a reasonable accommodation. "Essential functions" are "fundamental job duties of the employment position" as determined by, *inter alia,* the employer's judgment of whether a function is essential and written job descriptions. 29 C.F.R. §

---

*4 (D. Md. Dec. 5, 2014), as a case that shows what is required for a plaintiff to plead a "substantial impairment." (ECF 21-1 at 7 n.2). *Quarles* evaluated a plaintiff's claim that her diabetes limited her ability to walk under pre-ADAA caselaw, and concluded that "an allegation of *some* walking limitation is not an allegation of specific facts that create a plausible claim of a *substantial* walking limitation." *Id.* This court agrees with others that have found *Quarles* inconsistent with the intent of the ADAA to simplify the inquiry into the plaintiff's disability and the substantial impairments inherent in a diagnosis of diabetes. *See, e.g.*, *Maday v. Dooley*, No. 4:17-CV-04168-KES, 2019 WL 4935705, at *42 (D.S.D. Mar. 8, 2019), report and recommendation adopted as modified, No. 4:17-CV-04168-KES, 2019 WL 4747058 (D.S.D. Sept. 30, 2019), opinion corrected on denial of reconsideration sub nom. *Maday v. Pierre*, No. 4:17-CV-04168-KES, 2020 WL 4904055 (D.S.D. Aug. 20, 2020).

1630.2(n). A reasonable accommodation is one that enables the employee to perform the essential functions of the position. *See Jacobs*, 780 F.3d at 580. The Rehabilitation Act does not require an employer to accommodate an employee with a disability by eliminating or changing the essential functions of the position. *See id.* at 581 ("An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform all of the essential functions of her position.").

USPS argues, and Ocampo does not dispute, that delivering mail on foot in at times extreme weather conditions is an essential function of the CCA position. The position description the defendant attaches to its motion says as much,[4] (*see* ECF 21-2, Position Description, City Carrier Assistant (stating that a CCA's "functional purpose" is to "deliver[] and collect[] mail on foot or by vehicle under varying road and weather conditions")) and Ocampo's complaint includes facts suggesting that her supervisors considered the ability to deliver mail in extreme heat an essential function of the position. For example, after Ocampo requested a route that would not involve exposure to heat, Baldwin told her "you are not fit for duty, if you can't do a walking route." (ECF 1, Compl. ¶ 15). The question remains whether Ocampo has pled either that she could deliver and collect mail in all weather or that her requested accommodation would have enabled her to do so.

Ocampo argues that even without accommodation, she was able to complete the essential functions of her job, pointing to the days on which she was assigned an outdoor route and completed the route: August 27, 28, and 31 of 2018. Ocampo's performance on these days points

---

[4] On a motion to dismiss under Rule 12(b)(6), the court may consider materials outside the complaint without converting the motion into one for summary judgment if those materials are "integral to and explicitly relied upon in the complaint and if the plaintiff[] [does] not challenge [their] authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotation marks and alterations omitted). Ocampo does not contest the authenticity of the position description, and the duties of the CCA are integral to Ocampo's ultimate claim that the defendant failed to provide a reasonable accommodation for her in the position.

9

to the opposite conclusion, however. On August 27, Ocampo was able to deliver mail in hot weather, but only after taking for herself one of the accommodations she requested of the defendant—spending some time in an air-conditioned environment before returning to her route. (*Id.* ¶ 11). On August 28 and 31, Ocampo delivered mail in hot weather all day, but the negative health effects of doing so led her to not report for work on the days that followed her completion of her outdoor route without accommodation. (*Id.* ¶¶ 12–13, 16–17). It appears that an accommodation was necessary for her to perform the essential function of her position.[5]

The court finds that Ocampo has adequately alleged that with a reasonable accommodation, she could complete the essential functions of her job. The USPS argues that Ocampo's requested accommodations were not reasonable because they would have eliminated the essential function of delivering mail by foot in varying weather conditions. *See, e.g.*, *Luckiewicz v. Potter*, 670 F. Supp. 2d 400, 409–10 (E.D. Pa. 2009) (USPS was not required to grant a letter carrier's requests to work on certified mail notifications, deliver express mail, and pick up collections after an automobile accident left him unable to walk for months because those accommodations would have eliminated the essential function of delivering mail). Ocampo offered several possible accommodations to the defendant. Her doctor advised that she be able to take "more frequent breaks during days with high heat and be offered work in [an] air conditioned environment." (ECF 1, Compl. ¶¶ 13–14). Ocampo also offered to work collections, to deliver mail in high-rise buildings with air conditioning, or to complete only part of an assigned route. Most of these potential accommodations, including working collections and delivering mail in only air conditioned buildings, would eliminate the essential function of

---

[5] The defendant's assertion that Ocampo needed no accommodation because she apparently had no issue performing her duties in the summer of 2017 is unpersuasive, as it is not clear whether the weather conditions then were similar to those in August 2018 nor is it clear whether Ocampo suffered from diabetes at that time.

delivering mail in varying weather conditions, and it is possible to read the accommodation Ocampo's doctor proposed as one that would also eliminate that function by having her work only in an air conditioned environment. The issue is close, but the court finds that, viewing the complaint in the light most favorable to Ocampo, her doctor's recommendation can be read as proposing essentially those accommodations Ocampo took for herself when she was able to complete her outdoor route on August 27 without illness—to take frequent breaks and to spend at least some part of the day in an air-conditioned environment.

Because the court finds that Ocampo has adequately pled that she requested a reasonable accommodation, and because she alleges that the defendant rejected that proposal (*see id.* ¶ 15), Ocampo has adequately pled the fourth prong of her reasonable accommodation claim as well. Accordingly, the defendant's motion to dismiss Ocampo's reasonable accommodation claim under the Rehabilitation Act will be denied.

### b. Intentional Discrimination

Disability discrimination claims under the Rehabilitation Act are evaluated using the Title VII burden shifting framework which begins with the plaintiff establishing a *prima facie* case of discrimination—(1) that she had a disability; (2) that she was a qualified individual; and (3) that she suffered an adverse action because of her disability. *Fierce v. Burwell*, 101 F. Supp. 3d 543, 552 (D. Md. 2015) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50 (2003); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997)).[6] A complaint need not

---

[6] A plaintiff may also prove her discrimination claim by presenting direct or circumstantial evidence that her disability was a motivating factor in the employer's adverse employment action. *See Hill v. Lockheed Martin Logistics, Mgt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). Though Ocampo alleges that Baldwin made the statement that "the post office does not hire sick people" (ECF 1, Compl. ¶ 18) she does not argue the statement is direct or circumstantial evidence of a discriminatory motivation in seeking her resignation. Moreover, "[r]egardless of the type of evidence offered by a plaintiff as support for her discrimination claim (direct, circumstantial, or evidence of pretext)" the ultimate question is whether the plaintiff's disability "'actually motivated the employer's decision.'"

plead a prima facie case of discrimination to survive a motion to dismiss, but the factual allegations "must allow a 'court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *McCleary-Evans v. Md. Dep't of Transp., State Hwy. Admin.*, 780 F.3d 582, 584–85 (4th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The defendant argues, and the court agrees, that Ocampo fails to plausibly allege that the defendant took an adverse action against her because of her disability. Ocampo's complaint includes no facts from which the court could infer that an adverse action occurred at all. Her conclusory assertion in the complaint that she was terminated (*see* ECF 1, Compl. ¶ 19) is unsupported and conflicts with the other facts she includes in her complaint regarding her meeting with her supervisors during which her employment ended. Ocampo states that in that meeting Jeffries determined that Ocampo was deemed to have already resigned by failing to report to work from September 1 to September 4 and Ocampo herself felt she was being forced to resign. (*Id.* ¶¶ 18–19).[7] Nor does the allegation that Ocampo felt forced to quit support a theory of adverse action by constructive discharge. A resignation is "tantamount to an actual discharge" and thus an adverse action under federal discrimination law where "an employer discriminates against an employee to the point that [her] working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776–77 (2016). This standard is a significant hurdle for plaintiffs. Demonstrating intolerability requires more than a showing that the plaintiff faced "difficult or unpleasant working conditions." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). The conditions must be "beyond ordinary discrimination" and more significant than

---

*Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000)). As will be explained, Ocampo has not plausibly alleged that the defendant engaged in any adverse action in this case.

[7] The court also notes, but does not rely on, Ocampo's admission in her response to the motion to dismiss that she signed a letter of resignation on September 5, 2018. (ECF 24-1 at 4).

conduct that is severe and pervasive in a hostile work environment claim. *Id.* (citing *Pa. State Police v. Suders*, 542 U.S. 129, 146–47 (2004)). In assessing intolerability, the frequency and consistency of the conditions are highly relevant. "The more continuous the conduct, the more likely it will establish the required intolerability. On the other hand, when the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.*

The conduct Ocampo alleges here occurred over a period of about nine days. On two of those days, August 28 and 31, Ocampo was given a work assignment that was difficult and damaging to her health. When Ocampo expressed that these assignments were physically taxing, her supervisors were dismissive of her concerns and expressed that "sick people" should not be hired at USPS. (ECF 1, Compl. ¶¶ 15, 18). On one occasion, Ocampo was "berated" for taking a long time to complete a walking route. (*Id.* ¶ 16). On other days, however, Ocampo was given assignments that shielded her from the hot temperatures that were affecting her health or she did not report to work at all. The comments and assignments Ocampo describes were indeed unpleasant, but they were also inconsistent, infrequent, and occurred over a very brief period of time. From these facts, the court can infer, at most, that Ocampo "subjectively felt compelled to resign" and she believed it was in her best interest to do so, but far more is required to give rise to a claim for constructive discharge. *Brady*, 222 F. Supp. 3d at 476. The conditions the employee faced must be so objectively intolerable that "a reasonable person in the employee's position would have felt *compelled* to resign—that is, . . . [she] had *no choice* but to resign." *Id.* (internal quotation marks and alterations omitted); *compare Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (plaintiff's allegations that over a period of twenty years, supervisors yelled at her, gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back did not "establish the objectively intolerable working

13

conditions necessary to prove a constructive discharge") *with Reed v. Airtran Airways*, 531 F. Supp. 2d 660, 667 (D. Md. 2008) (plaintiff's allegations of consistent verbal and physical abuse, including coworkers throwing objects at her and vandalizing her home and car with racial and gendered obscenities plausibly suggested an objectively intolerable environment). Because the complaint fails to allege an adverse action, Ocampo's intentional discrimination claim will be dismissed.

## CONCLUSION

For the reasons stated herein, the defendant's motion to dismiss will be granted in part and denied in part. Ocampo's disability discrimination claim under the Rehabilitation Act and state law claims will be dismissed, but her failure to make a reasonable accommodation claim under the Rehabilitation Act may proceed. A separate order follows.

| | |
|---|---|
| __1/22/2021_____ | _____/S/_____ |
| Date | Catherine C. Blake |
| | United States District Judge |