IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

| | |
|---|---|
| **TERRI G. OCAMPO** | * |
| Plaintiff, | * |
| vs. | * |
| | * Case No.: 19-cv-02875-LKG |
| **LOUIS DEJOY, POSTMASTER GENERAL** | * |
| Defendant. | * |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Terri G. Ocampo ("Plaintiff"), by undersigned counsel, and pursuant to Local Rule 105, hereby submits this Memorandum of Law in Support of Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, and states as follows:

## I.   INTRODUCTION

In August 2017 Defendant employed Ms. Ocampo as a City Carrier Assistant ("CCA"). Her job responsibilities included delivering and collecting mail on a walking route or in a vehicle and sorting mails according to the route. ECF 43-3, Exh. 1 at 15. In 2003 Ms. Ocampo was diagnosed with diabetes, and have since lived with the condition, albeit with medical management. Before becoming employed by Defendant, Ms. Ocampo has a good work history in law enforcement and public service, without any negative impact from her diabetes. However, in late August 2018, due to severely hot weather, Ms. Ocampo began feeling ill while performing her duties as a CCA. Ms. Ocampo knew that she became ill because of the severe heat on her diabetic condition. As a result, beginning on August 27, 2018, she requested accommodation of a split walking route or walking route assigned with an air-conditioned vehicle. Mr. Baldwin denied Ms. Ocampo's request for accommodation on August 27, 2018, and August 28, 2018 before granted an accommodation on August 30, 2019, after receiving a medical note for Ms. Ocampo's doctor. However, on August 31, 2018,

1

Mr. Baldwin refused to provide a reasonable accommodation to Ms. Ocampo and effectively ended her employment with Defendant.

## II.     UNDISPUTED STATEMENT OF FACTS

In 2003 Ms. Ocampo was diagnosed with diabetes at Winn Army Community Hospital, Fort Stewart, 25 Georgia, which ended her career in the U.S. Army. ECF 43-3, Exh. 1 at 8, 64. Subsequently, she maintained a good work history in the law enforcement and public service without her condition affecting her employment. *Id.* at 64-67. In August 2017 Defendant hired Mrs. Ocampo as a City Carrier Assistant ("CCA") at its Middle River location, in Baltimore County. *Id.* at 14.  During this time, Ms. Ocampo was supervised by Phillip Baldwin, who was Ms. Ocampo's supervisor, Mr. Troy Griffin, her manager and Ms. Tashira Jefferies, her delivery supervisor. *Id.* at 20. (ROI Baldwin Affidavit, hereinafter Exhibit 1 at 1.) (ROI Jefferies Affidavit, hereinafter Exhibit 2 at 1.), (ROI Griffin Affidavit, hereinafter Exhibit 3 at 1.)

As a CCA, Ms. Ocampo's essential job duties was to deliver and collect mail on foot or by vehicle under varying road and weather conditions in a prescribed area. ECF 43-4, Exh. 2 at 1. This is carried out via assignment of delivery routes that are given to the CCAs by Defendant supervisors, and in the case of Ms. Ocampo, by Mr. Baldwin. ECF 43-3, Exh. 1 at 19, 21, 22, 25.  The delivery and collection of the mail by the CCA is done via the use of a non-air-conditioned truck ("LVT) on varying delivery routes. *Id.* This include all outdoor walking route primarily focus(focused) on the delivery and collection of mail at residential homes on the route. *Id.* There were also mix walking route involving delivery of mail to residents and businesses or to residents on a walking route and in apartment buildings. *Id.* At the Middle River location, there were also two air condition vehicles typically utilized by Defendant for collection assignment. *Id.* at 30, 48.

In late August 2018, a heat advisory was issued in the local area and temperature was severely hot for Ms. Ocampo. On or about August 27, 2018, while the heat advisory was in effect Ms. Ocampo reported for work and fell ill after working in the heat for a couple hours. Ms. Ocampo fell ill because the sever heat caused her blood sugar to fall. In response, Ms. Ocampo contacted her supervisor Mr. Baldwin and requested his permission to return to the office for a break in the airconditioned environment. *Id.* at 19-23. Mr. Baldwin's harsh response to Ms. Ocampo was: "find a shade tree and keep it moving." Ocampo's EEO Statement, hereinafter, Exhibit 4 at 1-2. However, after an hour or so, Ms. Ocampo had to return to the office for a break in the air-condition. After a brief break, Ms. Ocampo completed her delivery route and work assignments without feeling ill. *Id.* at 2. See also ECF 43-3, Exh. 1 at 29. Mr. Baldwin claimed that he provided Ms. Ocampo with a delivery route with shade, gave her an airconditioned vehicle, instructed her to take necessary brakes and provided water. Ex. 1 at 2.

On August 28, 2018, Ms. Ocampo reported for work while the heat advisory remained in effect and the temperature was severely hot for Ms. Ocampo. As a result, Ms. Ocampo asked Mr. Baldwin if he could assign her a mixed or partial walking route and collections to avoid becoming sick from the heat. Exh. 4 at 2. ECF 43-3, Exh. 1 at 19-21. Mr. Baldwin responded saying: "You are telling me you are not fit for duty; you are a CCA, and you have to have street time." *Id.* at 24. Mr. Baldwin then told Ms. Ocampo that she needed to provide a medical note from her doctor pertaining to her request for work accommodation. *Id.* Mr. Baldwin directed the Plaintiff to accept the assignment and begin work, which Ms. Ocampo did in the extreme heat. Exh. 4 at 2-3. Before leaving work Ms. Ocampo reported to Ms. Jefferies that Ms. Ocampo would be visiting the doctor on August 29, 2018, for a medical note on the accommodation requested by Ms. Ocampo as Mr. Baldwin requested. ECF 43-3, Exh. 1 at 45. Ms. Jefferies confirmed that the medical note was required. *Id.* at 42. Mr. Baldwin claimed that

on August 28, 2018, he provided Ms. Ocampo with a delivery route with shade, gave her an airconditioned vehicle, instructed her to take necessary brakes and provided water. Exh. 1 at 2.

On August 29, 2018, The Plaintiff visited her doctor who provided a medical note stating in part that Plaintiff: "is currently under my medical care for diabetes. Please make sure patient is able to take more frequent breaks during days with high heat and be offered work in air-conditioned environment, as extreme weather can have negative health impact." (Baltimore Medical Systems Note, hereinafter, Exhibit 5). On August 30, 2018, Ms. Ocampo reported to work and gave the doctor's notes to Mr. Baldwin. In response Mr. Baldwin assigned Mr. Ocampo to a delivery route along with an air-conditioned vehicle. ECF 43-3, Exh. 1 at 25, 30. However, on August 31, 2018, when Ms. Ocampo reported for work, Mr. Baldwin assigned Ms. Ocampo "Route 17" the longest all outdoor walking route at the location. *Id.* at 23-24, 32. Ms. Ocampo requested that Mr. Baldwin accommodated her with a mixed or partial walking route or an all-outdoor walking route with an air-conditioned vehicle. Id. at 27, 32. Ocampo's EEO Affidavit, hereinafter, Exhibit 6 at 3. Mr. Baldwin responded, that: "you are not fit for duty, if you can't do a walking route." Exh. 4 at 4. Plaintiff was forced to accept the assignment and work Route 17 during the severe heat, albeit by taking a few breaks. ECF 43-3, Exh. 1 at 28. Mr. Baldwin claim that on August 31, 2018, Ms. Ocampo never submitted her doctor's note requesting accommodation and that none was denied to Ms. Ocampo. Ex. 1 at 3. During this assignment, Ms. Ocampo was constantly called by Ms. Jefferies and questioned and warned about the time Ms. Ocampo was taking to complete Route 17. ECF 43-3, Exh. 1 at 34-36. Although Ms. Jefferies was aware of Ms. Ocampo's request for accommodation and Mr. Baldwin's tacit consent to Ms. Ocampo taking breaks, Ms. Jefferies nevertheless pressured Ms. Ocampo to complete the route in normal time. *Id.* at 33-42. Ms. Ocampo felt literally harassed by Ms. Jefferies's actions. *Id.* at 34. When Ms. Ocampo returned to the office she complained to Ms. Jefferies's that Ms. Jefferies was harassing and discriminating against Ms. Ocampo. *Id.*

at 36. However, Ms. Jefferies demanded that Ms. Ocampo return to the route and deliver a few more pieces of mail. *Id.* Ms. Ocampo declined to complete the route and sought intervention from her labour union and Ms. Jefferies directed Ms. Ocampo to leave Ms. Ocampo's work shirt and mail bag on Ms. Jefferies desk before Ms. Ocampo left. *Id.* at 38. Mr. Baldwin claim that Ms. Ocampo's action constituted refusal to work and a verbal resignation. Exh. 1 at 5 After initiating a grievance with the labour union, Ms. Ocampo was told to stand by and wait to hear from her supervisor. ECF 43-3, Exh. 1 at 49-51.

On September 5, 2018, Mr. Baldwin communicated with Ms. Ocampo, informing her that he had spoken with the union and directing her to return to work. *Id.* at 49. Ms. Ocampo reported for work on September 5, 2018, and again was assigned to work a walking route in the severely hot weather. After Ms. Ocampo began sorting mail for the route, she was called into the managers' office, Mr. Baldwin, Ms. Jefferies, and Mr. Griffin were present, along with Ms. Ocampo union's representative. ECF 43-3, Exh. 1 at 51. They were later joined via phone by Ms. Cheryl Turner. *Id.* At the meeting Ms. Turner expressed dissatisfaction with the return of Ms. Ocampo to work and questioned Mr. Baldwin about it. Ms. Turner stated that she did not consider Ms. Ocampo as still employed by the Defendant. Mr. Griffin told Ms. Ocampo that she had to resigned to be eligible for another position with Defendant and further told Ms. Ocampo that the post office doesn't hire sick people. *Id.* at 52. Exh. 3 at 5. Nothing was discussed about Ms. Ocampo's accommodation request. *Id.* The meeting ended with Ms. Ocampo informed and feeling pressured to resign, which she did. PS Form 2574 Ocampo Resignation, hereinafter, Exhibit 7 at 2.

### III.    STANDARD OF REVIEW

"If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," then summary judgment

5

may be rendered. Fed R. Civ. P. 56(c). In other words, summary judgment is only to be granted when no genuine and disputed issues of material fact remain, and the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). However, "[if] the moving party has met its responsibility of identifying the basis for its motion, the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" White v. Rockingham Radiologists, Ltd., 820 F.2d 98, 101 (4th Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Fed. R. Civ. P. 56(e)).

A genuine issue of material fact may exist if the evidence presented to the court is sufficient to indicate the existence of a factual dispute that could be resolved in favor of the non-moving party at trial. Rachael-Smith v. FTDATA, Inc., 247 F. Supp. 2d 734, 742 (citing Anderson v. Liberty Lobby, Inc.,477 U.S. 242 (1986)) Only "facts that might affect the outcome of the suit under the governing law" are material. Anderson, 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In considering a motion for summary judgment, the court does not weigh evidence of a genuine issue of material fact that a party adduces against the movant's evidence but submits it to the trier of fact for resolution. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In that context, a court must consider the facts and evidence of the non-moving party as true. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In addition, all reasonable inferences drawn from disputed evidence are to be resolved in the light most favorable to the nonmoving party. Pulliam Investment Co., Inc. v. Cameo Properties, 810 F.2d 1282, 1286 (4th Cir. 1987). The party seeking summary judgment bears the responsibility of demonstrating the "absence of a genuine issue of material fact." Celotex Corp. v. Catrett, All U.S. 317, 323 (1986)."

IV.     ARGUMENT

The facts and reasonable inferences to be drawn from the evidence in the records of the case shows that Defendant is not entitled to summary judgment because Ms. Ocampo has established a claim of failure to provide reasonable accommodation, against Defendant. The Rehabilitation Act prohibit federal agencies from discriminating against a qualified individual "solely by reason of her disability." 29 U.S.C. § 794(a). The Rehabilitation Act is violated if an employer fails to provide an employee with a reasonable accommodation for his/her disability. Under the Rehabilitation Act, to establish a claim for a failure to accommodate, Plaintiff must show that (1) she has a disability; (2) defendant knew of her disability; (3) with reasonable accommodations she is otherwise qualified to perform the essential functions of the position; and (4) defendant refused to make such reasonable accommodations. *Lewis v. Gibson*, 621 Fed. Appx. 163, 164 (4th Cir. 2015), *cert. denied sub nom. Lewis v. McDonald*, 136 S. Ct. 840 (2016). The Plaintiff has complied with all the requirements as set in the Lewis.

### A. PLAINTIFF HAS ESTABLISHED SHE WAS QUALIFIED INDIVIDUAL UNDER THE STATUTE.

Only persons who are 'qualified' for the job in question may state a claim for discrimination. *Tyndall v. Nat'l Educ. Centers, Inc.*, 31 F.3d 209, 212 (4th Cir. 1994). The regulations define a "qualified, individual" as a person who satisfies the requisite skill, experience, educational, and other job-related requirements of the position the individual holds or desires and who, with or without reasonable accommodation, can perform the essential functions of that position without endangering the health and safety of the individual or others. 29 C.F.R. § 1630.2(m). To determine whether an individual is qualified, the court "must decide (1) whether she could 'perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue,' and (2) if not, whether " 'any reasonable accommodation by the employer would enable [her] to perform those functions.' " *Tyndall v. Nat'l Educ. Centers, Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994) (quoting *Chandler v. City*

*of Dallas* , 2 F.3d 1385, 1393-94 (5th Cir. 1993) ); *see Halpern* , 669 F.3d at 462. "The plaintiff 'bears the burden of demonstrating that [the complainant] could perform the essential functions of her job.' " *E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP* , 616 F. App'x 588, 593 (4th Cir. 2015) (quoting Tyndall , 31 F.3d at 213 ); see Halpern , 669 F.3d at 462. Equal Emp't Opportunity Comm'n v. Mfrs. & Traders Tr. Co., 429 F. Supp. 3d 89, 108 (D. Md. 2019)

   **1. Plaintiff Was able to Perform the Essential Functions of her Letter Carrier Position.**

The facts shows that Ms. Ocampo was able to perform the essential function of her CCA position to deliver and collect mail by foot or vehicle in varying weather conditions.

   **a. Outdoor Delivery of Mail by Foot or by vehicle under varying route in Extreme Weather Is an Essential Function of the Letter Carrier Position.**

Plaintiff does not dispute weather the essential functions of her CCA position included delivery of mail by foot or by vehicle under varying road and weather conditions. The Standard Job Description for the CCA position provides, in pertinent part, that the functional purpose of the position is to deliver and collect mail "on foot or by vehicle under varying road and weather conditions in a prescribed area." ECF 43-4, Exh. 2 at 1. However, this function is organized and structured by Defendant through assignments of varying delivery routes, using air-conditioned and non-air-conditioned vehicles. Delivery routes included all outdoor walking routes, mixed walking routes that included delivery in apartments and commercial buildings, ECF 43-3, Exh. 1 at 19, 21, 22, 25.  The persuasive citation by Defendant from other courts are distinguishable from the instant case. [(*See, e.g*., *Shiring v. Runyon*, 90 F. 3d 827, 831 (3d Cir. 1996) ("One of the essential functions of a mail carrier is to physically deliver the mail to the people along the route."); *Luckiewicz v. Potter*, 670 F. Supp. 2d 400, 409-20 (E.D. Pa. 2009) (USPS was not required to grant a letter carrier's requests to work on certified mail notifications, deliver express mail, and pick up collections after an automobile accident left him unable to walk for months because those accommodations would have eliminated the

8

essential function of delivering mail along a regular route); *Rio v. Runyon*, 972 F. Supp. 1446, 1457 (S.D. Fla. 1997) ("mail delivery is an essential function of the letter carrier position"); *Sidaris v. Runyon*, 967 F. Supp. 1260, 1267 (M.D. Ala 1997) ("[D]elivery of the mail during hot temperatures is an essential element of the [letter carrier] position").]

For instance, in the Shiring case we can infer that the individual was unable to physically deliver the mail to the people along the route while Ms. Ocampo can deliver the mail with reasonable accommodations. On 27 and 28 August 2018, Ms Ocampo demonstrated the fact that can deliver mail after taking breaks. *ECF 43-3, Exh. 1 at 22*. And on 30 August 2018 while provided with a vehicle the Plaintiff was able to physically deliver mail. *Exh. 4 at 3*. Furthermore, The Luckiewicz's case and Ocampo's case are not quite similar; in the latter case the letter carrier will be unable to do his/her job for months and the accommodation will be for quite a long time while the Ocampo requires accommodation during severe heat days only. *ECF 43-3, Exh. 1 at 22*. She requested that during these severe hot days, she should be given a mixed route or be given a vehicle which will still enable her to perform her essential functions. *Id.* at 22. Most importantly these requests are the normal course of performing the essential functions of the CCA position, as organized and assigned by the Defendant

### b. Plaintiff Could Deliver Mail on All Outdoor Walking Routes in Extreme Heat.

The CCA's delivery and collection of mail "on foot or by vehicle under varying road and weather conditions in a prescribed area" was implemented through assignment of delivery routes to the CCAs by Defendant supervisors. The assignments are carried out using a non-air-conditioned truck ("LVT") on varying delivery routes. *Id*. at 22, 23, 25. These delivery routes include all outdoor walking route, primarily focused on the delivery and collection of mail at residential homes on the route. There were also mix walking route involving delivery of mail to residents and businesses or to residents on a walking route and in apartment buildings. *Id* 19, 21, 22, 25. At Defendant's Middle River location where Ms. Ocampo worked, there were

also two air-conditioned vehicles typically utilized by Defendant for CCA collection assignments. *Id*. at 30, 48.

It can be reasonably inferred that prior to the heat advisory Ms. Ocampo had been assigned to work any of these varying delivery/collection routes, which all included the delivery and collection of mail by foot or by vehicle. After the heat advisory and its negative effects on Ms. Ocampo's diabetic condition, the facts showed that Ms. Ocampo performed her duties to collect and delivery mail by foot or by vehicle. Despite the onset of illness on August 27, 2018, Ms. Ocampo reported for work, as well as on August 28, 2018, and completed her CCA duties on all walking routes on both days. *Id.* at 22. Although Ms. Ocampo would take a few breaks on these days, breaks were apparently not unusual on delivery route assignments, since on August 27, 2018, Mr. Baldwin told Ms. Ocampo to: "find a shade tree and keep it moving." Exh. 4 at 1-2. Additionally, on August 31, 2018, Mr. Baldwin assigned Ms. Ocampo "Route 17" the longest all outdoor walking route at the location and refused to provide her with reasonable accommodation. ECF 43-3, Exh. 1 at 23-24, 32. Here again, Ms. Ocampo worked Route 17, with a few breaks, and only failed to complete the route after constant calls and complaints by Ms. Jefferies that Ms. Ocampo was not on time. *Id.* at 28, 33-42.

Importantly, even if Defendant had assigned Ms. Ocampo a mixed walking route, which included partial residential delivery and collection and partial delivery and collections in commercial buildings or apartment building, this would be in the normal course of performing the essential functions of the CCA position, as organized and delegated by Defendant.

Although Ms. Ocampo's doctor requested that the accommodation for Ms. Ocampo to include: "be able to take more frequent breaks during days with high heat and be offered work in air-conditioned environment.," these accommodations would not prevent Ms. Ocampo from performing the delivery and collection of mail in the severely or extremely hot weather conditions. *Id.* at 19-22. (Emphasis added). The evidence shows clearly that the air-conditioned

environment that Ms. Ocampo sought was the mixed or partial walking route, where she would have an opportunity to benefit from the cool air in the commercial or apartment buildings as she delivers and collect mail on the route. *Id.* at 26. The mixed or partial walking routes were normally assigned to CC as routine assignments.

### c. The Accommodations Requested by Plaintiff Would have Enable Her to perform the essential responsibilities of her CCA position.

"Reasonable accommodations" are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). A reasonable accommodation is one that enables the employee to perform the essential functions of the position. *See Jacobs*, 780 F.3d at 580.

Here the "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which Ms. Ocampo performed the CCA position that Ms. Ocampo sought was to be assigned a mix walking route, which included residential, commercial and apartment buildings delivery and collection of mail. ECF 43-3, Exh. 1 at 26. The delivery and collection of the mail is however still done by foot and by vehicle. For assignments on all outdoor walking routes, such as Route 17, Ms. Ocampo was seeking the modification or adjustment of been assigned one of two air-conditioned delivery vehicles at the location, as opposed to the non-air-conditioned LTVs that are regularly assigned to CCAs on walking routes. *Id.* at 27. Ms. Ocampo also suggest doing collections of boxes which involve the use of the air-conditioned vehicle. *Id.* at 33. Furthermore, these modification or adjustments were sought for only those few days when there was a heat advisory due to severe heat. *Id.* at 22.

Assigning Ms. Ocampo to work a mixed or partial walking route, is arguably not an accommodation, as this was routinely done for CCAs as part of their duties of delivering and collecting mail by foot or by vehicle in varying weather conditions. However, assuming mixed

11

or partial walking routes constitutes an accommodation, the facts shows that this adjustment or modification would have enabled Ms. Ocampo to perform the duties of delivering and collecting mail my by foot or by vehicle in the extreme heat, because this is the duty involved on a mix delivery route assignment. Additionally, the facts shows that when Mr. Baldwin provided Ms. Ocampo with an air-conditioned vehicle on August 30, 20218, she was able to perform the functions of her CCA position. Exh. 4 at 3. Furthermore, the breaks that Ms. Ocampo took on August 27 and 28, 2018 enabled her to complete her all-walking routes assignments on those days. ECF 43-3, Exh. 1 at 22.

**2. Plaintiff's Requested Accommodations were Reasonable.**

Ms. Ocampo's request for a mixed or partial walking route, use of an air-conditioned vehicle on all walking route and or frequent breaks, during a few days of extreme heat, were reasonable accommodation requests. The court in Jacobs stated that a reasonable accommodation is one that enables the employee to perform the essential functions of the position. These requests would not eliminate or change the essential function of Ms. Ocampo's CCA duty to deliver mail by foot or by vehicle in varying weather conditions. These requests would only result in slight modification or adjustments to the function of the CCA position for Ms. Ocampo, and only for a few days during heat advisory weather. Assigning Ms. Ocampo on a mix or partial walking route would enable Ms. Ocampo to deliver the mail by foot and by vehicle in the severe heat, while getting some relief in airconditioned buildings as he delivers and collects the mail.

Defendant's misconstrue the court's comments in ECF 26 at 10-11. the MTD, claiming that:

> "this Court already recognized that Plaintiff's requests to work collections and deliver mail in only air-conditioned buildings eliminated the essential function of delivering mail in varying weather conditions: Ocampo also offered to do mail collections, to deliver mail in high-rise buildings with air conditioning, or to complete only part of an assigned route. Most of these potential accommodations, including the mail collection work and delivering mail in only air-conditioned buildings, would not eliminate the essential

12

function of delivering mail in varying weather conditions. However, it is possible to read the accommodation Ocampo's doctor proposed as one that would also eliminate that function by having her work only in an air-conditioned environment." ECF 43-1 at 12

This characterization, overlook the court's finding that 'its' a close call." Furthermore, the facts obtained in discovery shows that indeed the requested accommodation were modification or adjustments involving change in delivery route assignments that would not eliminate the CCA function to deliver mail by food or vehicle in the extremely hot weather.

### B. DEFENDANT DID NOT OFFER MS. OCAMPO REASONABLE ACCOMMODATIONS.

Except for August 30, 2018, the only accommodation offered to Ms. Ocampo by her supervisor Mr. Baldwin, was "find a shade tree and keep it moving." ***Exh. 4*** at 1-2. This is the nature of breaks on a full walking route that Mr. Baldwin agreed to. ***ECF 43-3, Exh. 1 at*** 33. However, the facts shows that the breaks Ms. Ocampo took on a full walking route such as Route 17, saw her taking cool air in convenient stores or a McDonalds restaurant along the route. These locations which were not part of Ms. Ocampo's delivery assignment and consumed lot more break time, then if Ms. Ocampo was getting cool air in a building or location that was part of her assignment. *Id.* at 33-34. The mixed walking routes would provide Ms. Ocampo with the requested accommodation facilitated by the cool air from the locations and assignments on the delivery route. "The fact that an unacceptable situation has been tolerated does not mean that the accommodation that has been made is reasonable. Business (public or private) must be soundly managed, and lax employment practices need not be continued in perpetuity." Jones v. Baltimore County, Maryland, (Md. 2001}, Civil Nos. JFM-99-3444, Civil No. JFM-00-1949, at *1 (D. Md. May 18, 2001). Although Ms. Ocampo took breaks at inconvenient store and McDonalds restaurant, or rest under a shady tree as Mr. Baldwin offered, these were unacceptable circumstances and effectively interrupted Ms. Ocampo's performance of her job duties as a CCA. Consequently what Mr. Baldwin offered Ms. Ocampo was not reasonable accommodation.

Additionally, the purported accommodation given by Mr. Baldwin to Ms. Ocampo was undermined and unsupported by another of Ms. Ocampo's delivery supervisor, Ms. Jefferies, who badgered Ms. Ocampo over completing the delivery route assignment on time, leading to Ms. Ocampo filing a union grievance on August 31, 2018, and her forced resignation on September 5, 2018. *Id*. at 34-45. The shows that the accommodation offered by Mr. Baldwin was not seriously contemplated and effected consistent with Defendant's policies and procedures. It is also telling that the day after August 30, 2018, when Mr. Baldwin received Ms. Ocampo's doctor's notes for accommodation and provided Ms. Ocampo with an air-conditioned vehicle as an accommodation to perform her delivery route assignment, on August 31, 2018, Mr. Baldwin assigned Ms. Ocampo Route 17 and did not offer the Plaintiff accommodation on the day.

## CONCLUSION

WHEREFORE, of the foregoing reasons, material facts are in dispute and Defendant is not entitled to summary judgment as a matter of law, as set forth in this memorandum. Ms. Ocampo is entitled to have the trier of facts make a determination in her case.

Respectfully Submitted,

*/s/ George Rose*
Federal Bar No.: 26086
Rose Law Firm, LLC
9134 Liberty Road
Randallstown, MD  21133
Telephone: 410-727-7555
Facsimile: 443-320-0962
Email: grose@roselawfirm.net
Attorneys for *Terri Ocampo*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of June 2022, a copy of the foregoing Memorandum of Law in Support of Plaintiff's Response in Opposition to Defendant's

Motion for Summary Judgment, was electronically filed in accordance with the Electronic Filing Requirements and Procedures as established by the U.S. District Court for the District of Maryland.

        */s/* George A. Rose, Esq.